UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ROBERT L. MURRAY,

        Plaintiff,

v.

RC II NEPHEW, et al.,

        Defendants.

9:13-CV-1056
(FJS/ATB)

ROBERT L. MURRAY, Plaintiff, *pro se*
C. HARRIS DAGUE, AAG, for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In what remains of this civil rights complaint, plaintiff alleges that defendant Gail Provost, a Rehabilitation Counselor II, improperly disclosed plaintiff's medical information in front of corrections officers in violation of his First Amendment rights. Plaintiff also alleges defendants Provost and Sara Nephew, also a Rehabilitation Counselor II, retaliated against plaintiff because he had filed prior law suits against them. Plaintiff seeks monetary as well as injunctive relief.[1]

---

[1] On November 13, 2014, plaintiff was released on parole. (Dkt. No. 40-8) (Department of Corrections and Community Supervision ("DOCCS") "Inmate Information." http://nysdoccslookup.doccs.ny.gov. Plaintiff had requested that defendants send him to an "out side [sic]" hospital for treatment. (Complaint "Compl." ¶ 8). Because plaintiff has now been released from incarceration, any such request for injunctive relief is moot. *Hallett v. NYS Dep't of Correct. Svcs.*, 109 F. Supp. 2d 190, 196 (S.D.N.Y. 2000) (because plaintiff was no longer incarcerated and under the supervision of any of the defendants, his requests for injunctive relief were dismissed as moot).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 40). Also pending before the court is plaintiff's motion for appointment of counsel.[2] (Dkt. No. 39). Plaintiff has not responded to the summary judgment motion.[3] For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint on the merits.

I. **Relevant Facts**

In the complaint, plaintiff alleges that he was taken to the Office of Mental Health ("OMH") at Clinton Correctional Facility ("Clinton"). The reason that plaintiff gives for being "taken" to OMH is quite different than defendants' explanation, but the

---

[2] Before the court can request that counsel represent a plaintiff pro bono, the court must determine that the complaint is of substance. *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)). If the claim meets this threshold requirement, the Court should then consider a number of other factors in making its determination. *Id.* However, the most important factor is the "substance" of the complaint. *McDowell v. State of N.Y.*, No. 91 CIV. 2440, 1991 WL 177271, at *1 (S.D.N.Y. Sept. 3, 1991) (quoting *Cooper v. A. Sargenti & Co., Inc.*, 877 F.2d 170, 172 (2d Cir. 1989)). In view of this court's review of the evidence for purposes of the summary judgment motion, this court finds that the complaint does not meet the threshold requirement of "substance" and will deny plaintiff's motion for appointment of counsel. Plaintiff's failure to keep the court and defense counsel apprised of his address also makes appointment of counsel difficult.

[3] Plaintiff filed his motion for appointment of counsel on October 22, 2014, and defendants filed their motion for summary judgment on November 17, 2014. (Dkt. Nos. 39, 40). Plaintiff filed his change of address notice on November 20, 2014, (Dkt. No. 43), stating that he had been released from incarceration and resided at 276 East 171 St. Rm. 4, Bronx, New York. The Clerk of the Court sent the "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion" to the correctional facility and two other addresses, one of which was the address listed in plaintiff's change of address notice. (Dkt. Nos. 42, 44). On December 1, 2014, the Clerk's mail was "Returned as Undeliverable." (Dkt. No. 44). It is unclear whether plaintiff has moved from the address that he originally filed with the court on November 20, 2014. Although it does not appear that defendants re-served the actual summary judgment motion on his new address, the Clerk's mail has been returned undeliverable, thus, an attempt to re-serve the motion papers would be futile.

2

factual difference is irrelevant to the court's decision.[4]  When plaintiff arrived at OMH, he saw defendants Nephew and Provost.  Defendant Provost is a Rehabilitation Counselor II at the OMH Satellite Unit of the Central New York Psychiatric Center ("CNYPC") at Clinton. (Provost Decl. ¶ 1).  Defendant Provost states that on May 16, 2013, she received an "emergency referral" from DOCCS medical staff. (Provost Decl. ¶ 7) (Dkt. No. 40-4).  Plaintiff had been refusing to take his prescription medication for approximately one week, and he had been observed sitting in the corner of his cell with his mattress overturned for a couple of days. (*Id.* & Ex. A).  He was brought to OMH in restraints because he refused to leave his cell. (*Id.* ¶ 8).

Pursuant to OMH procedures, defendant Provost attempted to interview plaintiff when he arrived to determine why he had been refusing his medication and to evaluate his overall health. (*Id.* ¶ 9).  Throughout the attempted interview, plaintiff refused to answer defendant Provost's questions, insisted there was nothing wrong with him, and became outwardly hostile toward her. (*Id.*)  When defendant Provost asked about the medications, plaintiff began shouting at her, even though she tried to explain that he needed to answer the question so that she could evaluate why he was brought to OMH on an emergency basis. (*Id.* ¶ 10).  Defendant Provost told plaintiff that if he would not cooperate with her, she would have to admit him to OMH for an assessment.  Despite

---

[4] Plaintiff claims that on May 16, 2013, a sergeant came to plaintiff's cell and told him he had to go to OMH to pick up the mental health records that he ordered. (Compl. ¶ 6 at 1) (Dkt. No. 1) (plaintiff has numbered the pages of his "FACTS," (¶ 6 of the Compl.) beginning with 1, and the court will cite to the pages as numbered by plaintiff).  Plaintiff claims that he told the sergeant that he was afraid to go to OMH because "thay [sic] be putting hand [sic] on me." (*Id.*)  According to plaintiff, the sergeant told him not to worry, that the sergeant would take him there and bring him back, so he put handcuffs on plaintiff and brought him up to OMH. (*Id.*)

3

this explanation, plaintiff continued to "escalate the situation by shouting and swearing" at her. (*Id.*)

Because of plaintiff's behavior, defendant Provost was unable to complete the assessment of his mental health condition, and she concluded, based on her experience as a rehabilitation counselor, that plaintiff "posed a risk of harm to himself and/or others." (*Id.* ¶ 11). Defendant Provost then admitted plaintiff to OMH and had him placed in an "OBS" (observation) cell so that his condition could stabilize, and OMH staff could attempt further assessment.[5] (*Id.* & Ex. B) (Dkt. Nos. 40-4, 41-1). Defendant Provost has attached a copy of the OBS Logbook dated May 16, 2013 as Ex. C to her declaration.

Defendant Provost states that although she remembers raising the issue of plaintiff's refusal to take his "prescription medication," she does not remember specifying what type of medication it was.[6] (*Id.* ¶ 12). Defendant Provost states that, to the extent that any such communication may have occurred, it would only have been in the context of her attempt at clinically assessing plaintiff's condition, particularly due

---

[5] Exhibit B to the Provost Declaration is her Primary Therapist Progress Note, dated May 16, 2013). (Dkt. No. 41-1). Defendant Provost noted that plaintiff's posture was "hostile," his speech was clear and coherent, but angry and hostile, "hollering and shouting." His thoughts were "clear," and he was "threatening legal action if held in observation or if attempt [sic] to assess." His mood was "agitated and hostile," his affect was "congruent to mood," and his insight and judgment were "poor." Plaintiff denied any suicidal or homicidal ideation, but defendant Provost indicated that she was unable to assess, and plaintiff was placed in OBS for "observation." (Id. at p.2).

[6] Her contemporaneous notes in Exhibit B confirm her statement. Although her notes state that she asked why he was not taking "medical medication," there is no mention of the type of medication that plaintiff was refusing to take, and the focus of the attempted interview was his mental status. (Dkt. No. 41-1).

4

to the report of his repeated refusal to take his medication, which caused the emergency referral in the first instance. (*Id.*) Defendant Provost states that she has never discussed or otherwise communicated any information regarding a specific condition from which plaintiff may suffer, nor the medication he takes, outside of a "clinical setting or in a gratuitous manner." (*Id.* ¶ 13). Any OMH or DOCCS staff that may have been present during any discussion of plaintiff's medication would have been present only for clinical or facility security purposes. (*Id.*)

Finally defendant Provost states that plaintiff's prior lawsuits against her and other OMH staff had "absolutely nothing" to do with his admission to OMH on May 16, 2013. Defendant Provost states that regardless of the lawsuits, she would have admitted plaintiff to the OBS cell in OMH based upon his hostile and unstable behavior after the emergency referral as noted in her progress notes of May 16th. (*Id.* ¶ 14). She states that she did not retaliate against plaintiff in any way. (*Id.* ¶ 15).

Defendant Nephew has also submitted a declaration in support of the summary judgment motion. (Nephew Decl.) (Dkt. No. 40-6). Defendant Nephew is also a Rehabilitation Counselor II in the OMH Satellite Unit at Clinton. (Nephew Decl. ¶ 1). Defendant Nephew was not plaintiff's "primary counselor." (*Id.* ¶ 5). Defendant Nephew states that, on May 16, 2013, when plaintiff was brought to OMH as an "emergency referral," he would have been seen by his primary counselor, defendant Provost. (*Id.* ¶ 6). Defendant Nephew states that, based upon her "RCTP Observation Notes," she did not personally examine "or interact" with plaintiff on May 16, 2013. (*Id.* ¶ 7). On May 20, 2013, defendant Nephew was assigned to conduct "rounds" and

5

"visited" plaintiff. (*Id.* ¶ 8 & Ex. A) (Dkt. Nos. 40-6, 41-2).

Defendant Nephew's notes from May 20, 2013 state that plaintiff had remained "free from harm to self in RCTP." (Nephew Ex. A). He had been accepting meals, but was observed lying on the floor of his cell. When approached for assessment by the nursing staff, he uncovered his face and yelled at the nurse and at security personnel. (*Id.*) Defendant Nephew noted that plaintiff did not respond or even make eye contact when she offered to interview him on May 20, 2013. He was lying on the floor of his cell, covered with his mat. Defendant Nephew stated that she was familiar with plaintiff from previous admissions.

> He is quite litigious and was over heard [sic] by this writer screaming threats of lawsuits when admitted to RCTP last week. Per review of OMH record and being present on unit on date of admission, Mr. Murray was clearly agitated, yelling and not in control of his behavior. He presented as a clear potential danger to self and or [sic] others due to his significant agitation. At this time, staff is unable to assess for discharge due to patient not being cooperative. Continue to monitor in observation with basic amenities for safety and assessment.

(Nephew Ex. A) (Dkt. No. 41-2).

Defendant Nephew states that she did not make the decision to admit plaintiff to OBS on May 16, 2013, nor did she have any involvement in the evaluation of his status upon admission that day. (Nephew Decl. ¶ 10). As his primary counselor, defendant Provost would have made that determination. (*Id.*) Defendant Nephew's only interaction with plaintiff occurred on May 20, 2013, when she attempted to evaluate his mental health status as part of her regularly assigned OBS rounds. (*Id.* & Ex. A).

6

Defendant Nephew states that she did not retaliate against plaintiff "at any time, in any way." (*Id.* ¶ 11).

Defendants have also submitted excerpts from plaintiff's July 31, 2014 deposition as an exhibit. (Dkt. No. 40-9). During the deposition, plaintiff testified that a "Doe Nurse" asked him why he was not taking his specific medication and mentioned the condition for which he was taking the medication. (Pl.'s Dep. at 81).[7] Plaintiff states that after she asked him about his medications, he told her that she could not open up his "medicals" like that. It was against the law. (Pl.'s Dep. at 82). Plaintiff testified that after Nurse Doe left the office, defendant Provost came in "and asked the same thing that the nurse did." (*Id.*) Plaintiff stated that the corrections officers were "still in the room . . ." (*Id.*) However, even though plaintiff was convinced that the officers heard the question about his medication, none of the officers ever said anything to plaintiff regarding the defendants' alleged question. (*Id.* at 82-83).

## II. <u>Summary Judgment</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*. However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is

---

[7] Although defendants have only submitted four pages of plaintiff's deposition, the court will cite to the page of the deposition transcript that is at the top right hand corner of the page.

some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id*.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*. A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court "'is not required

to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

### III. Disclosure of Medical Information

#### A. Legal Standards

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994) (citing *Whalen v. Roe*, 429 U.S. 589, 599 (1977)). This right is protected by the Due Process Clause. *O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005) (citing *Whalen*, 429 U.S. at 598-600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.'" *Matson v. Bd. of Ed. of City School Dist. of New York*, 631 F.3d 57, 64 (2d Cir. 2011) (quoting inter alia *Doe*, 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999). However, where the sensitive information is spread through "humor or gossip," it is more likely that the inmate's right to privacy will have been violated. *Rodriguez v.*

9

*Ames*, 287 F. Supp. 2d 213, 220 (citing *Powell*, 175 F.3d at 112).

### B. Application

In this case, plaintiff alleges that defendant Provost asked him why he was not taking his "H-V" medication in front of corrections officers[8] who were in the same office.[9] Defendant Provost alleges that she did not mention the type of medication or the condition for which plaintiff was taking the medication. However, even if she had mentioned plaintiff's condition or the medication, it would not have made a difference in this case. Plaintiff was brought to OMH in part, because he had been refusing to take his medication. If defendant Provost had asked about the specific medication, it was only to establish what plaintiff's problem could be. There is absolutely no allegation by plaintiff that the disclosure was for any reason other that medical/mental diagnoses. Plaintiff testified at his deposition that he only *assumed* that the officers heard the question about his medication. None of the officers ever said anything to plaintiff about his condition, the medication, or any other subject. (Pl.'s Dep. at 82).

In addition, it is clear that the officers who were present in the room were officers who were on security duty in OMH. Plaintiff does not allege otherwise. As defendants point out, the security personnel who work in a facility's medical/mental unit are designated as members of the prison's "health care component," for purposes of

---

[8] Plaintiff never mentions how many officers were in the room with plaintiff and defendant Provost during the interview.

[9] Defendants concede that plaintiff's HIV status would be a condition that is entitled to constitutional protection.

HIPAA.[10] *See Warren v. Corcoran*, No. 9:09-CV-1146, 2011 WL 5599587, at *7 (N.D.N.Y. Oct. 20, 2011) (Rep't Rec), *adopted by* 2011 WL 5599620 (N.D.N.Y. Nov. 17, 2011) (discussing statutory bases for confidentiality). These officers are also bound by New York State statutory confidentiality rules, and disclosure of personal medical information to them is permissible. *See* N.Y. Pub. Off. Law § 74(3)(c) ("no officer or employee of a state agency . . . should disclose confidential information which he has gained by reason of his official position of authority"). Thus, there was no unconstitutional or inappropriate disclosure of medical/mental information.

Additionally, even if the court could find that plaintiff's right to privacy was violated, plaintiff's claim would fail. Defendant Provost is a non-security female staff member of OMH, and the facility has a legitimate penological interest in protecting its civilian staff from the threat of violence. The presence of security officers during defendant Provost's attempt at interviewing and assessing plaintiff's condition served the valid penological interest of protecting defendant Provost from a potentially aggressive inmate. As stated in the progress notes, plaintiff was hostile and shouting at defendant Provost. Defendant Provost had a legitimate reason for asking plaintiff why he stopped taking his medication, there were no inappropriate comments by the corrections officers, and there was no indication that the information went any further than the individuals who were in the room with plaintiff and defendant Provost. Therefore, plaintiff's claim against defendant Provost may be dismissed.

---

[10] Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d 1320d-8.

## IV. <u>Retaliation</u>

### A. Legal Standards

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.* The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.*

Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)). Once the plaintiff's burden of proving the three-part test is satisfied, "the burden then shifts to the defendant to show that the plaintiff would have

12

received the same punishment even absent the retaliatory motivation." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.2002) (citing *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996)). Thus, under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham*, 89 F.3d at 79 (citations omitted).

### B. Application

Plaintiff claims that defendants placed him in OBS in retaliation for his previous lawsuits against them. Filing lawsuits is unquestionably constitutionally protected activity. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (the right to petition the government for redress of grievances in both judicial and administrative fora is "among the most precious of the liberties safegarded by the Bill of Rights"). Thus, the court will assume that plaintiff has met the first requirement in the retaliation analysis.

Although defendant Provost does not concede that there was any retaliatory motive, she argues that she would have admitted plaintiff to OBS even if there had been such a motive. (Def.s' Mem. of Law at 11-12). Based upon the medical records filed by defendants, it is clear that plaintiff had behaving strangely for several days, when the officers referred him to OMH on an "emergency basis." When defendant Provost attempted to interview him to determine why he had stopped taking his medications, plaintiff insisted there was "nothing" wrong, but became hostile as a result. Because defendant Provost could not complete her assessment of plaintiff and could not determine a reason for his behavior, she admitted him to OBS for observation and re-assessment after his behavior stabilized. The documentary evidence supports her

13

statements and her decision. No rational fact finder could credit plaintiff's conclusory claims to the contrary.[11] Thus, defendant Provost would have taken the same action regardless of any lawsuits filed by plaintiff against her and regardless of any alleged retaliatory motive.

Defendant Nephew never had contact with plaintiff until March 20th, four days after his admission to OBS. She was not personally involved in the decision to admit him to OBS, and she alleges only that she heard him shouting on May 16th. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). The medical records confirm that defendant Provost made the decision to place plaintiff in OBS, and that defendant Nephew had no involvement in his evaluation or his placement on May 16th. Defendant Nephew only saw plaintiff four days later when he was one of the inmates who she was assigned to visit on her rounds. (Nephew Decl. ¶¶ 8-10). Thus, any retaliation claim may be dismissed as against defendant Nephew for lack of personal involvement.[12]

---

[11] *See, e.g., Benitez v. Pecenco*, No. 92 Civ. 7670, 1995 WL 444352 at *7 n.5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White*, 9:08-CV-200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record).

[12] To the extent that plaintiff is attempting to sue the defendants in their official capacities for damages, the Eleventh Amendment would also bar the action. The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)). This is true whether the court is considering

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion for appointment of counsel (Dkt. No. 39) is **DENIED**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 40) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (*citing Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 24, 2015

_____
Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n.3. An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87 & n.1 (2d Cir. 1991) (citations omitted). Thus, the Eleventh Amendment would have precluded a claim for damages under section 1983 against defendants in their *official* capacities.